UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 2:08-CR-106 |
| V. | ) | |
| | ) | |
| DANIEL P. DAVIS | ) | |

# REPORT AND RECOMMENDATION

Defendant is charged with being a convicted felon in possession of a firearm. Much of the physical evidence that will be introduced against him resulted from a search of his residence on August 3, 2008, as well as the seizure of his vehicle on that same date. He has filed a motion to suppress that evidence, and to have it returned to him. (Doc. 13). The motion has been referred to the United States Magistrate Judge under the standing orders of this Court and pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on March 4, 2009.

During the late afternoon of August 3, 2008, Chris Brotherton was a patron of the Hide-A-Way Club on Bolton Road in Greeneville, Greene County, Tennessee. The Hide-A-Way Club, simply stated, is a bar. As Brotherton exited the building to prepare to get on his motorcycle and leave, an individual driving a 1998 brown Dodge Durango SUV pulled up behind Brotherton and, through the open passenger window, began firing a handgun. The total number of shots fired is unclear, but Brotherton was hit five times (once in the head), and several bullets struck the building, one passing entirely through the building and another

bullet expending itself inside.[1]

The Greene County Sheriffs Department was called, and Patrol Officer Willett responded to the Club. Witnesses described the SUV to Officer Willett, one of whom was able to provide the vehicle tag number to Willett. One or more of the witnesses identified the shooter as Daniel Davis, the defendant herein, and that he had most likely gone to his home at 1600 Kingsport Highway, only a short distance from the club.

Willett, by himself, immediately went to 1600 Kingsport Highway. It bears mentioning that Willett went to this address without any assistance because of his concern that a potential killer, still armed, was on the loose and posed a clear danger to anyone and everyone.

When Willett arrived he observed a brown Dodge Durango SUV parked in the driveway. The tag number on the vehicle matched the number provided by the witness at the scene. Willett looked into the vehicle only to confirm that no one was in it. He could feel heat radiating from the vehicle, indicating that it had just been driven.

As Willett walked towards the front door of the house, he noticed a surveillance camera affixed to the house, pointed directly at the Durango vehicle. Willett walked to the door and knocked. The door was answered by two females, one black and one white. Willett asked if Daniel Davis was present; the women advised that he was not there, and they did not know where he was, although they confirmed that he did live there. They also confirmed that

---

[1]Remarkably, Brotherton survived.

Case 2:08-cr-00106-JRG   Document 18   Filed 03/06/09   Page 2 of 13   PageID #: 42

they resided in the house. Willett then asked if he could come into the house to see for himself that Davis was not there, and the women consented.

As Willett followed the women into the house, one of them walked towards a bedroom. Fearful that Davis might be in that room, Willett followed her. However, the only person in the room was a black male, asleep in the bed. Willett awakened the man, and then directed that all three occupants of the house stay together in the living room while Willett conducted his search. They complied. Willett also noticed two more surveillance cameras inside the house.

Before Willett commenced his search, Sergeant Rader of the Greene County Sheriffs Department arrived at the residence to assist Willett. Willett and Rader primarily were looking for Davis, the shooter, but they were also looking for the gun used by Davis. In the bedroom, the officers lifted the mattress off the bed in order to see if Davis was hiding beneath the bed. As they lifted the mattress, they discovered seven hundred dollars in currency sandwiched between the mattress and the box springs. There was a piece of bedroom furniture - most likely a chest of drawers - in the bedroom, and Willett used his hand to feel about the top of it to see if a gun was there. Rather than a gun, he found an additional seven hundred dollars in currency.

The officers noticed dirt and debris on the floor immediately beneath a pull-down stairway that provided access to the attic. The dirt and debris suggested that someone had recently pulled the stairs down to gain access to the attic. Sergeant Rader testified that it is rather common for fugitives to hide in the attics of houses. The officers pulled the steps

down, and climbed into the attic. Immediately adjacent to the top of the steps was a digital recording machine sitting atop a pedestal, with a "gob of wires" running into and out of the recorder. Having seen the surveillance camera outside, and at least two more surveillance cameras inside the house, Willett concluded that the recorder served those surveillance cameras. Recalling that the camera outside was pointed directly at the SUV in the driveway, the officers reasonably believed that the machine likely had recorded the arrival of the SUV, the time of that arrival, and the identity of the driver. The officers thereupon disconnected the recorder and took possession of it. Willett questioned the three occupants of the residence regarding the recording machine, and all three denied any knowledge of it.[2]

As Willett talked to the occupants, Sergeant Rader went back outside and looked into the SUV. He saw three gun shell casings in the passenger compartment, plainly visible from the outside. He then telephoned Detective Randolph, telling the detective what he had seen inside the SUV. Wishing to have the interior of the vehicle tested for gunshot residue, Detective Randolph instructed Sergeant Rader that he should not search the vehicle, but rather should have it towed to the Sheriffs Department.

After the SUV was towed to the impoundment lot at the Sheriffs Department, Detective Randolph applied for and obtained a warrant from a state judge to search the interior of the vehicle and the recorder.[3] In addition to securing samples for gun residue

---

[2] An answer which any reasonable person would believe was an outright lie, in light of the obvious presence of three surveillance cameras.

[3] Defendant does not contest the validity of the search warrant.

testing, Randolph found a total of five nine millimeter shell casings inside the vehicle. According to the government's response to defendant's motion, the recording device contained images of defendant driving away in the vehicle prior to the shooting, and returning in the same vehicle after the shooting.[4]

Some time later, Detective Randolph returned to 1600 Kingsport Highway for the purpose of conducting an additional search of the house, and the area surrounding the house (including nearby woods) in an effort to find the handgun.[5] The three occupants of the house had disappeared in the interim. A key had been broken off in the lock in a successful effort to jam it, and someone had been entering the house through both a broken front window and a broken rear window. The owner of the house, who was never named, had accompanied Detective Randolph and gave his verbal consent for Randolph to search both the house and the surrounding area. This particular search is of no legal significance as far as this case is concerned, since the only thing Randolph found was an empty nine millimeter shell casing lying in the gravel in the general area where the SUV had been parked. This shell casing was in plain view, and no one, including defendant herein, could have had a reasonable expectation of privacy regarding a shell casing lying on the ground in a gravel driveway, exposed to public view.

One issue which can be disposed of summarily is the fourteen hundred dollars in currency. The Assistant United States Attorney announced during the hearing that the

---

[4]Doc. 14, p. 2.

[5]The handgun has yet to be found.

5

government did not intend to introduce this currency as evidence, because it had no relevance to this case. Detective Randolph thereupon volunteered that the currency had no relevance to the pending state charges against defendant for attempted murder. In light of Detective Randolph's statement, AUSA Reeves stated that he had no objection to that portion of defendant's motion that demanded a return of the money.

Inasmuch as there is no dispute regarding the currency, the only questions that remain concern the digital recording device, the shell casings, and the Dodge Durango.

As an initial matter, the fact that the officers subsequently applied for and obtained a search warrant for both the recording device and the vehicle is irrelevant to the motion to suppress; the recording device and the vehicle already had been seized without a warrant, and taken into the custody of the sheriffs department. The subsequent issuance of a search warrant could not retroactively validate the earlier warrantless seizure since the intrusion upon possessory rights protected by the Fourth Amendment had already occurred. Either the warrantless seizure was valid under the Fourth Amendment, or it was not; if the latter, the evidence must be suppressed.

### *THE RECORDING DEVICE*

It is undisputed that the two females who answered Officer Willet's knock resided at 1600 Kingsport Highway, along with the black male and the defendant, Daniel Davis. As legitimate occupants of that dwelling, the two women had authority to consent to Officer Willett's entry into, and search of, the dwelling. *See, Georgia v. Randolph*, 547 U.S. 103 (2006). Defendant, however, argues that Willett had consent only to search for the

6

defendant, and that he and Sergeant Rader broadened the search beyond the scope of the permission granted to them by their seizure of the recording device, as a result of which evidence of any recording on the device should be suppressed.

These officers had no search warrant, of course, but they did have consent. That consent was requested only to search for Daniel Davis, and therefore their seizure of the recording device was outside the scope of the permission granted by the women. The question then becomes, can Willett's seizure of the device be upheld under the "plain view doctrine?"

As already discussed, these officers knew that the surveillance camera outside the house was pointed directly at the Dodge Durango. They also recognized that the recording device in the attic served the surveillance cameras,[6] and that the machine likely contained extremely valuable evidence regarding the time of arrival of the SUV and the identity of its driver.

Before he began considering the unusual facts presented by this case, the author of this report and recommendation thought he understood the plain view doctrine: "an officer may seize items 'in plain view,' assuming the officer is lawfully present and the incriminating character of the item is 'immediately apparent.'" SIXTH CIRCUIT CRIMINAL HANDBOOK, 2008 Ed. § 20 [citing, *Horton v. California*, 496 U.S. 128 (1990); *United States v. Bradshaw*, 102 F.3d 204 (6th Cir. 1996)]. Here, there is no doubt that Officer Willett had probable cause to

---

[6]It would be ridiculous to assume that a DVD recorder in an attic would be attached to a television set.

7

Case 2:08-cr-00106-JRG   Document 18   Filed 03/06/09   Page 7 of 13   PageID #: 47

believe that the recording machine contained images of the comings and goings of the Dodge Durango. The only way that there would not have been such images on the machine would have been if the machine was defective or intentionally disabled, i.e., turned off. Probable cause, of course, has never been equated with "absolute certainty;" it is only "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Thus, the remote possibility that the machine was defective or turned off has no effect on the question of probable cause. Stated another way, these officers, as well as anyone else, could legitimately assume that the recording device was operable.

But is the "immediately apparent incriminating character" aspect of the plain view doctrine an independent and additional requirement to its application? In other words, are there two requirements, one that there be probable cause, *and* another that the incriminating character of the evidence is immediately apparent?

In *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), the police had obtained a search warrant for defendant's vehicle which was parked in his driveway. After that search warrant was invalidated because it was not issued by a neutral and detached magistrate, the state attempted to justify the search of the vehicle on several bases, including the plain view doctrine. In a plurality opinion with multiple parts and multiple concurring and dissenting opinions - confusing enough on that account alone - Justice Stewart undertook to define the plain view doctrine. The usefulness of *Coolidge* in deciding the case before this court is extremely questionable in light of two subsequent Supreme Court opinions which flatly

stated that Justice Stewart's analysis of the plain view doctrine was a plurality opinion, and was not a binding precedent. *Texas v. Brown*, 460 U.S. 730, 737 (1983); *Horton v. California*, 496 U.S. 128, 136 (1990).

In *Texas v. Brown*, during the course of a legitimate traffic stop, the officer noticed that a party balloon, knotted at its tip, dropped from the driver's hand onto the seat beside him. Knowing from experience that people frequently kept narcotics in balloons in this fashion, and after seeing small plastic vials, quantities of loose white powder, and a bag of party balloons in the open glove compartment, the officer seized the balloon and arrested the defendant. A later test of the material in the balloon revealed that it was heroin. 460 U.S. at 734-35.

The Texas Court of Criminal Appeals rejected the state's argument that the balloon was properly seized under the plain view doctrine, holding that the officer "had no *know* that 'incriminatory evidence was before him when he seized the balloon.'" *Id.*, 735. (Italics in original).

After mildly criticizing the plurality opinion in *Coolidge*, *id.,* 737-8, the *Brown* court reaffirmed that the plain view doctrine was merely a manifestation of "the rule that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Id.*, 739.

As pertinent to the "immediately apparent" question, the *Brown* court stated:

> [T]he Court of Criminal Appeals, as we have noted, felt the state's case ran aground on the requirement that the incriminating nature of the items be "immediately apparent" to the police officer. To the Court of Appeals, this apparently meant that

9

the officer must be possessed of near certainty as to the seizable nature of the items. Decisions by this Court since *Coolidge* indicate that the use of the phrase "immediately apparent" was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the "plain view" doctrine. *Id*., 741.

In *Colorado v. Bannister,* 449 U.S. 1, 3-4, 101 S.Ct. 42 at 43-44, 66 L.Ed.2d 1, we applied what was in substance the plain view doctrine to an officer's seizure of evidence from an automobile. *Id.,* at n. 4. The officer noticed that the occupants of the automobile matched a description of persons suspected of a theft and that auto parts in the open glove compartment of the car similarly resembled ones reported stolen. The Court held that these facts supplied the officer with "probable cause," *id.,* at 4, 101 S.Ct., at 43, and therefore, that he could seize the incriminating items from the car without a warrant. Plainly, the Court did not view the "immediately apparent" language of *Coolidge* as establishing any requirement that a police officer "know" that certain items are contraband or evidence of a crime. Indeed, *Colorado v. Bannister, supra,* was merely an application of the rule, set forth in *Payton v. New York,* 445 U.S. 573, . . . , that "[t]he seizure of property in plain view involves no invasion of privacy and *is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.*" *Id.,* at 587, 100 S.Ct., at 1380 (emphasis added). We think this statement of the rule from *Payton, supra,* requiring probable cause for seizure in the ordinary case, is consistent with the Fourth Amendment and we reaffirm it here.

460 U.S. at 741. (Emphasis in original).

\* \* \*

With these considerations in mind it is plain that [the officer] possessed probable cause to believe that the balloon in [the defendant's] hand contained an illicit substance.

*Id*., 742.

Reading *Horton v. California* and *Texas v. Brown* together, for the plain view doctrine to apply, the following facts must be present: (1) the officer must be lawfully located in a place where the object could be plainly seen, (2) the officer had a lawful right of access to the object itself, and (3) the incriminating character of the object must have been

10

"immediately apparent," *meaning that the officer had probable cause to believe that the object was evidence of a crime*.

Officers Willett and Rader undeniably had authority to be in the defendant's house generally. Since they had the occupants' consent to search for the defendant himself, based upon their experience and training that fugitives frequently hide in attics, not to mention evidence that someone had recently climbed into the attic, it was within the scope of their permission for these officers to enter the attic.

Once they were into the attic - a place they had a right to be, as just discussed - they immediately saw the digital recording machine. It was in plain view, sitting atop a pedestal adjacent to the entrance.

Lastly, Officer Willet immediately knew the significance of the recording machine in light of the surveillance cameras affixed to the house. More specifically, he knew the significance of the recording machine with relation to the crime he was then investigating, since the camera at the outside of the building was aimed directly at the Dodge Durango and would have recorded the movements of that vehicle. He knew by eyewitness accounts that that vehicle was the one used by defendant when he sprayed a hail of bullets into Chris Brotherton. A visual record of the arrival of that vehicle at 1600 Kingsport Highway would be additional evidence regarding the identity of the shooter. In other words, there was probable cause to believe that the recorder contained evidence of the crime for which Officer Willett was then actively pursuing defendant.

The "plain view" exception to the Fourth Amendment's requirement for a warrant

applies, and the recorder was properly seized.

## *THE DODGE DURANGO*

The Dodge Durango also was seized without a warrant and towed to the sheriffs department impound lot. However, its warrantless seizure was not solely dependent upon the plain view doctrine.[7] The officers had been told by eyewitnesses to the attempted assassination that the shooter was Daniel Davis, that he was driving a brown Dodge Durango, and that he likely had driven back to his residence at 1600 Kingsport Highway. Moreover, a witness provided the vehicle tag number to the officers. When Willett arrived at 1600 Kingsport Highway, the brown Dodge Durango was parked in the driveway, and of course the license tag matched the number provided by the witness. As if anything else was needed, the vehicle was warm, indicating that it had recently been driven.

The vehicle itself, no less than the gun used by the defendant, was an instrumentality of the shooting; it was contraband itself, and it contained contraband (the shell casings) in plain view. Thus, it could be seized without a warrant. *Florida v. White*, 526 U.S. 559 (1999).

## *THE SHELL CASINGS*

The shell casing found in the driveway has already been discussed; defendant had no reasonable expectation of privacy in a shell casing lying in the driveway and exposed to public view.

---

[7]Although the plain view doctrine would apply.

At least three shell casings were in plain view through the windows of the vehicle. Although the vehicle could have been searched without the necessity of getting a warrant, *Florida v. Meyer*, 466 U.S. 380 (1984), a search warrant supported by probable cause was issued before the vehicle was actually entered and a total of five shall casings recovered.

## *RECOMMENDATION*

It is respectfully recommended that defendant's motion to suppress be DENIED, with the understanding that the United States will not attempt to introduce the currency into evidence. It is further recommended that the currency - $1,400.00 - be returned to defendant, or his order.[8]

          s/ Dennis H. Inman
          United States Magistrate Judge

---

[8] Any objections to this report and recommendation must be filed within ten (10) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).